IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JENNIFER HULTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 22-1584 (MN) |
| | ) |
| ARTESIAN WATER COMPANY, | ) |
| | ) |
| Defendant. | ) |

**<u>MEMORANDUM OPINION</u>**

Jennifer Hulton, Lincoln University, PA – Pro Se Plaintiff.

Lauren Elizabeth Moak Russell, Potter Anderson & Corroon LLP, Wilmington, DE – Attorney for Defendant.

December 19, 2023
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Plaintiff Jennifer Hulton, proceeding *pro se*, filed this employment discrimination case against her former employer, Defendant Artesian Water Company, on December 12, 2022. Pending is Defendant's motion to dismiss for lack of prosecution or, in the alternative, for summary judgment. (D.I. 28). Plaintiff did not file a response to Defendant's motion. The same day Defendant's motion for summary judgment was filed, the deadline for dispositive motions, Plaintiff filed a letter containing arguments in support of her Complaint and requesting $175,000. (D.I. 32). Also pending are Defendant's motion to amend the scheduling order and to compel plaintiff's compliance with discovery (D.I. 22), and Plaintiff's request for a meeting (D.I. 23).

**I.      BACKGROUND**

**A.      Pending Motions**

Plaintiff never sat for a deposition in this case. During discovery, she filed a request to deny deposition. (D.I. 13). In denying that request, the Court noted that "Plaintiff chose to bring this lawsuit" and "she must either move forward to prosecute it or dismiss it." (D.I. 19 at 2). The Court proceeded to explain the importance of Plaintiff sitting for a deposition, in compliance with both the Federal Rules of Civil Procedure and this Court's Local Rules. (*Id.* at 2-3).

Prior to filing its summary judgment motion, Defendant filed a motion to amend the scheduling order and to compel plaintiff's compliance with discovery (D.I. 22), and Plaintiff filed a request for a meeting (D.I. 23). These motions remain pending. Defendant's motion largely discussed difficulties securing Plaintiff's deposition. Defendant moved for summary judgment, on the deadline date for filing dispositive motions, without the benefit of having deposed Defendant. Plaintiff's request for a meeting largely involved what she deemed improper behavior by Defendant's counsel in attempting to secure her deposition and other discovery. Both the motion and request will be denied as moot.

B. **Factual Background**

Plaintiff was employed by Defendant as a Lead Systems Analyst in the Information Technology ("IT") Department from November 1, 2016, through August 2, 2021, when she was terminated. In her Complaint, Plaintiff claimed that her termination was discriminatory in violation of the Americans with Disabilities Act ("ADA"), in that it arose based on accommodations she required after returning to work on August 31, 2020, following a June 2020 ACL reconstructive surgery. She alleged that the initial plan was for her to work 7-hour days upon her return, that it quickly became evident that she could not sit for 7 hours, that her doctor ordered a restricted work schedule, and that, immediately thereafter, she was subjected to continuous hostility and attacks from IT management and the Human Resources department.

The summary judgment record contains Plaintiff's annual Performance Appraisals, which were completed by IT management, and Plaintiff's contemporaneous annual self-appraisals, completed on a form entitled "Employee Performance Appraisal." (D.I. 30-1 at 9-48). These appraisals date back to an initial 90-day appraisal completed in February 2017. Combined, the appraisals establish that Plaintiff excelled at the technical aspects of her position, took ownership of tasks, and completed tasks on schedule with a high level of quality.

The same appraisal documentation, however, establish a growing rift over the years between Plaintiff and her managers. Plaintiff's managers' concerns centered around their perception of her challenges with setting reasonable deadlines in terms of completion dates and work hours required, her objection both to her workload and the reassignment of some of her projects to other members of the department, her challenges with differentiating between the priority level of requests from end users, her lack of delegation of work to colleagues, and issues with how she displayed and communicated her stress to colleagues and how it impacted her.

These criticisms reached their apex in Plaintiff's December 2019 Performance Appraisal, dated February 21, 2020. In addition to addressing these themes, in the December 2019 Performance Appraisal, management noted that Plaintiff "has demonstrated a disregard and unwillingness to respond to both formal & informal feedback and management instructions related to prioritizing work life balance," and provided five narrative examples that took up nearly a page of the evaluation. (D.I. 30-1 at 36). The examples provided were:

- "On multiple occasions [Plaintiff] informed her manager of personal commitments that would require her arrive physically at work late or leave early, to which, on multiple occasions, her manager instructed her to work from home. On many of these instances [Plaintiff] would physically come to work despite the ability to and instruction to work from home."

- "On multiple occasions [Plaintiff] has canceled or moved requested and approved vacation days to perform tasks that were not mission critical or time sensitive issues or requiring her personally to perform the task and/or could have been rescheduled or reassigned to others by working with her teammates/management. This ultimately resulted in requesting an exception to company policy in order to carry over vacation time, which was approved to promote the work life balanced noted in this section."

- "On multiple occasions [Plaintiff] indicated to other team members or informally to her manager that she would alter personal plans or did not request vacation due to performing routine "monitoring of batch" (which is a shared task amongst all Analyst team members on a weekly rotating basis with assignment being determined within the Analyst team themselves) or assisting another team member with routine verification after a patching/outage even. [Plaintiff] received multiple informal reminders and a formal reminder that these tasks are routinely switched amongst team members via team discussion. It was also offered that her manager would take on the task himself in the event she was not able to find a capable or willing replacement. [Plaintiff] routinely failed to exercise any of these options and would choose to execute the work herself. This further continued after a discussion with HR and IT Management in which work life balance and taking vacation was stressed."

- "When executing the People Tools upgrade, when at a point where her work was substantially complete ahead of the planned go-live, which would have allowed a break between the user acceptance testing and go-live, [Plaintiff] chose to move up the go-live of the People Tools product, rather than using the extra time to take some work life balance by using vacation time. The

3

- choice to take time off rather than moving-up the go-live was reiterated in both a discussion with her manager, and a separate discussion with her manager and the VP of Accounting. Upon her completion of the PeopleSoft project, the Analyst team was beginning a UC4 upgrade project."

- "[Plaintiff] was informed by her manager that her involvement in this project was to be minimal as the other two technical analysts were tasked as leading this effort and had taken implementation training to support them in this role. [Plaintiff] was asked to not factor this project in her vacation plans. During this project, [Plaintiff] chose to insert herself in the project in a more active role then discussed, attending almost all meetings. Although she was not explicitly told not to become involved, this was contrary to her manager's guidance."

(*Id.*).

For her part, in her December 2019 Employee Performance Appraisal, Plaintiff not only acknowledged the rift that had grown between management and herself, but repeatedly expressed that she felt her termination was imminent. Examples include:

- It also prevented me from feeling comfortable taking vacation and due to the extent of the project which should not have been a one person project, **I had a constant feeling that I was being setup for failure and would be terminated if I did not work the way I was**. This feeling was based on emails, lack of communication from team and management, having to work long hours to meet dates that had been communicated to the business only after having discussed/emailed those same dates within IT and receiving no feedback/push back on proposed dates and resources.

- **This past year I felt that I was purposely being setup to fail and Artesian was building a case for termination**. With each scope change in the project I would updated and distribute the high-level project plan and worked toward the dates outline when no feedback was received. Throughout my career I have successfully managed multiple projects with large teams which does require that management at the start of a project management give validity to the direction. Because I was the only person performing the work I had to work long hours to meet the communicated high-level dates and I felt like I was being put in a position to not only be successful in the project outcome and my ability to lead a project. **To prevent giving Artesian any reason to terminate me and to try to prove my dedication and hope for a long term career, I felt that I had to work long hours and not take vacation just so I could ensure the project was successful**.

4

- I would like Artesian Water to state what their plans for me are before answering this question. **As much as would like a long term career with Artesian, I don't feel that Artesian feels the same way. I really would like to come to work not wondering if today will be the day I am terminated.**

- **Starting in April I have felt that I was being setup for failure and that Artesian was building a case to terminate me.** I did discuss my fears and concerns with management (4/15/19, 5/10/19, 7/12/19) regarding termination and that I was not being allowed to grow and maintain my skills which Pierre and stated in 2018 was required by IT staff if they wanted long term careers at Artesian.

- Yes, I pushed up the go-live date because my health was failing and I feared that the doctor would put me on disability and **I honestly figured that once the upgrade was competed, I would be terminated.**

- Because of the email received and no assistance with internal resources in addition to work I would typically perform but reassigned, **it appeared to me that Artesian was documenting a case for termination** and therefore I stopped raising the issue.

- **Because I felt like my termination [was] imminent** I presumed the reason a meeting was never scheduled.

- This year has been extremely challenging and frankly disappointing. I know the **constant fear of termination** and feeling that I was being setup for failure drove me to work harder and guarantee perfection for the work I was doing. . . . After the number of times I discussed concerns with management for resource assistance and reassigning of my work to others without being notified by management as to why this was being done led me to believe voicing my concerns and issues was a detriment to my career at Artesian.

(*Id.* at 41-42, 43-46) (emphasis added).

On June 8, 2020, approximately four months after the completion of Plaintiff's 2019 Performance Appraisal, she informed Human Resources and IT management that she might need to undergo surgery for her knee on June 26, 2020, and inquired what would be needed from her and her doctors. (D.I. 30 at 5). Human Resources promptly provided Plaintiff with information

5

containing the short-term disability ("STD") leave available to her, relevant paperwork, and other requirements. (*Id.* at 6-7).

In an August 20, 2020 Clinical Update, Plaintiff's physician recommended that she return to work on September 2, 2020 for seven hours per day, not to exceed 35 hours per week. (*Id.* at 12). Upon Plaintiff's request, the return-to-work date was changed to September 1, 2020. (*Id.* at 14). On August 27, 2020, the hour reduction was acknowledged by Human Resources, with instructions to Plaintiff that it was her responsibility to only work 7 hours per day; to accurately record her hours on her time card in compliance with regulations under the Family & Medical Leave Act ("FMLA") and STD policies; and that if she failed to do so she could jeopardize her FMLA/STD claim, which would result in disciplinary action, including possible termination. (*Id.*). For the nine months, Plaintiff's physician repeatedly changed Plaintiff's work restrictions, based on her medical condition, and requested accommodations. The record establishes that Defendant promptly complied with all restrictions and accommodation requests.[1]

---

[1] On September 3, 2020, Plaintiff and her physician updated Human Resources and IT management that, due to Plaintiff's significant pain when sitting her first two days back at work, the physician was restricting her to 4 hours of work per day, not to exceed 20 hours a week, with Plaintiff returning to 8-hour workdays on September 25, 2020. The September 3, 2020 restriction was immediately implemented. On September 25, 2020, Human Resources received a Clinical Update from Plaintiff's physician increasing her daily hours to 6, not to exceed 30 hours per week, rather than the planned return to 8-hour workdays. This restriction was immediately implemented. (D.I. 30 at 16-21, 24-25). On October 23, 2020, Defendant received a fax from Plaintiff's physician approving a full-time work schedule, with the accommodation of working from home, effective October 19, 2020. (*Id.* at 36). On October 27, 2020, this accommodation was implemented with an effective date of October 19, 2020. (*Id.* at 43). At the time, all of Defendant's office staff continued to work remotely, so to the extent this was an accommodation, it did not require any arrangement beyond what was then standard. On November 5, 2020, Plaintiff's physician updated Plaintiff's restriction to allow her return to work with the accommodation of a new chair, a standing desk, and preferential parking. (*Id.* at 44). These accommodations were implemented. (*Id.* at 45-46, 79, 81, 82). On December 17, 2020, Defendant received another work restriction from Plaintiff's physician, which, was ultimately implemented to include Plaintiff taking paid time off until January 4, 2021, and

Issues similar to those documented in Plaintiff's performance appraisals continued to arise following her return from surgery. In September 2020, she asked to have the due date of a project pushed back, and the project was ultimately reassigned. In emails, Plaintiff complained about "yet again hav[ing] something removed from me," and expressed that "los[ing] an application [she] had vested interest which [they] ha[d] discussed, ha[d] [her] very concerned that Artesia [did] not value [her] as an employee or growing [her] skills so [she] [could] add value long term." (D.I. 30 at 23). She also referenced challenges of completing the work due to her limited hours and needing to "put[] in more hours than specified by the doctor" to try to complete the project. (*Id.* at 22). She further expressed that she did not know how she could demonstrate her commitment to a long career with Defendant given that her "long hours, extensive documentation, knowledge share, and being a team player ha[d] not afforded [her] new opportunities." (*Id.* at 23). She then noted that she "just wanted to make [IT management] aware of [her] disappointment as outlined in last year's review." (*Id.*). An IT manager informed her that, "as it relates to the assignment of projects and timelines, [his] role [was] to balance the concerns & initiatives of the organization & ambitions of the entire team." (*Id.*).

---

then returning with a 6 hour per day restriction. (*Id.* at 48, 54, 73, 79; D.I. 30-1 at 3). In a March 3, 2021 Clinical Update, Plaintiff's physician maintained the 6-hour workday restriction, but requested two 15-minute breaks and a 30 minute break in the day. (D.I. 30-1 at 4). These additional accommodations were promptly implemented. (D.I. 30 at 79). Plaintiff's physician again recommended that Plaintiff stop working and go on STD on April 19, 2021. (*Id.* at 71). Plaintiff's leave request was promptly granted. (*Id.* at 72). Plaintiff returned to work full-time, effective May 20, 2021, with the previous accommodations in place, i.e., a standing desk, comfortable chair, and preferential parking. (*Id.* at 83-85; D.I. 30-1 at 6, 8). Throughout this entire period, Plaintiff, much like the rest of the IT staff, mostly worked remotely as a result of the COVID-19 pandemic, but she returned to a hybrid schedule for with the rest of the IT staff on July 5, 2021, with the above-referenced accommodations in place, and maintained such a schedule through the end of her employment with Defendant. (D.I. 31 at ¶¶ 11-14).

On October 13, 2020, Plaintiff conveyed in an email to her IT manager, with Human Resources copied, that she could not meet upcoming deadlines for two projects "without working [her] normal 10-11 hour days." (*Id.*). She also noted that she was planning on taking a couple of consecutive days off to try and reduce her pain level, but that she had been unable to do so as a result of her workload. (*Id.*). Her IT manager asked her to provide "proposed completion dates . . . so that [he] [could] factor that into departmental responsibilities & resources assignments for the remaining fourth quarter activities." (*Id.*). In a separate email to Human Resources that day, Plaintiff wrote that she felt like she was in a "catch 22" in "making every effort to meet [Defendant's] expectations while trying to get [her] health back to 100 percent." (*Id.* at 27). She noted that she had included Human Resources on her email to her manager so they knew that she could not meet expectations due to her medical restrictions, but she expressed that, "by telling management [she] cannot meet the new directives set this week will be reflected negatively yet if [she] said nothing and put in extended hours to meet both current and new expectations then [she] [was] not adhering to the doctor's orders and [she] [was] going against STD and prolonging [her] recovery." (*Id.*). She asked Human Resources to provide her with her estimated remaining vacation time. (*Id.*). In response, the Human Resources representative said he would work on getting her "a vacation adjustment estimation," and advised her to reach out to the Human Resources Director regarding her concerns with work expectations. (*Id.*).

In her response to her IT manager the following day, Plaintiff provided proposed completion dates, as requested, but also discussed her concerns regarding her reduced responsibilities since her return, and stated that she was "trying to decide if [she] should disregard [her] current health situation and try to get the doctor to allow [her] to work 6 hours 7 days a week, or just accept the consequences when the doctors restrictions are lifted." (*Id.* at 33). In a follow

8

up email to her IT manager, on which she copied Human Resources, Plaintiff wrote that she would "not attempt to take vacation and [she] [would] make every effort to" complete the projects on deadline. (*Id.* at 34). The Human Resources Director sent Plaintiff an email the next day, noting that the relevant emails had been forwarded to her. (*Id.* at 35). She clarified that Plaintiff's health came first, that Defendant had a responsibility to follow her physician's restrictions, that Plaintiff should not work hours in excess of those, that her work contribution should be adjusted accordingly, and that there were not expectations for her to perform in the manner she had prior to going on STD. (*Id.*). She also noted that they had always encouraged Plaintiff to use her vacation and time and continued to do so. (*Id.*).

In December 2020, Plaintiff went on vacation, but chose to monitor a shared IT mailbox and then emailed IT management with a "high" importance level, asking for some guidance so that she could set up a phone meeting the following day with a vendor who had emailed. (*Id.* at 50). When her email went unanswered for four hours, she sent a follow up email expressing frustration that the lack of a response was resulting in her working longer hours on her vacation. (*Id.*). Her IT manager responded that working during vacation was a "self-determined activity" and that "[c]onsistent with a theme from [her] prior review: in this particular case the below issue is not an urgent matter requiring immediate attention, not something that warrants interrupting scheduled time off, and could have been addressed by any of [her] teammates with access to the shared mailbox." (*Id.* at 49).

Confusion and problems over Plaintiff's hours continued in December and through early 2021, with Plaintiff expressing her feelings of pressure to work more than her restricted hours to avoid creating a negative impression, and IT management and Human Resources advising her repeatedly that she should only work the hours approved by her physician and should document

her hours as worked.  (*Id.* at 52-61, 66-68, 78).  According to an unrebutted sworn declaration submitted by Plaintiff's IT manager, she requested a meeting with him in July 2021, during which she raised issues such as the volume of her work, her belief that he colleagues were not doing their share, and her discomfort in interacting with her colleagues.  (D.I. 31 ¶¶ 15-17).  The manager concluded the employment relationship was "irretrievably broken" due to Plaintiff's persistent interpersonal conflicts, workload issues and consistent "refusal to accept managerial guidance regarding the need to share her workload and take leave when necessary."  (*Id.* ¶ 18).  He then consulted with the Director of Human Resources, and Plaintiff's employment was terminated, effective August 2, 2021.  (*Id.* ¶¶ 19-20).

        Plaintiff did not file a response to Defendant's motion for summary judgment.  She also did not file a motion for summary judgment.  She did, however, file a letter to the Court on the same day Defendant filed its motion for summary judgment (which was the deadline date for filing dispositive motions).  In her letter, she appears to request that judgment be entered in her favor and that she be awarded $175,000.  (D.I. 32).  She asserts that Defendant failed to fully comply with her discovery requests though she never filed a motion to compel.  She also makes unsworn allegations and assertions regarding matters she is "prepared to present" if the case goes to trial, including by putting witnesses under oath.  (*Id.* at 3-5).  Defendant filed a letter response to Plaintiff's letter, arguing that, to extent Plaintiff's letter could be construed as a motion for summary judgment, it should be denied.  (D.I. 35).

## II.      <u>LEGAL STANDARDS</u>

        A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the burden of

persuasion at trial would be on the non-moving party, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the non-moving party's case, after which the burden of production shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). "[A] dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* (internal quotation marks omitted). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460-61.

The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). "[T]he facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true . . . ." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). If "there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Id.* at 1081 (internal quotation marks omitted).

## III. DISCUSSION

Plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a prima facie ADA claim, Plaintiff must establish that she: (1) has a "disability," (2) is a "qualified individual," and (3) has suffered an adverse employment action because of that disability. *McNelis v. Penn. Power & Light Co.*, 867 F.3d 411, 414 (3d Cir. 2017) (citing *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006)). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to establish a legitimate, nondiscriminatory case for the adverse employment action. *See McDonnell Douglas Corp.*, 411 U.S. at 802. The defendant only needs to provide a legitimate reason for the discharge, which is generally understood as a "relatively light" burden. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The plaintiff can rebut this reason by showing that it is pretextual and not legitimate. *See In re Tribune Media Co.*, 902 F.3d 384, 392 (3d Cir. 2018).

For purposes of the motion for summary judgment, Defendant does not dispute that Plaintiff has a disability, is a qualified individual, and suffered an adverse employment action. Defendant contends, however, that Plaintiff has failed to identify evidence sufficient to demonstrate that her termination resulted from her disability.

Thus, the only issue before the Court is whether Plaintiff's termination occurred under circumstances that could give rise to an inference of intentional discrimination based on her disability. More precisely, the issue is whether Defendant has established that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law based either on Plaintiff's failure to demonstrate such an inference, or Plaintiff's failure to rebut Defendant's proffered reason for her termination as pretextual and illegitimate.

Even assuming, *arguendo*, that Plaintiff has demonstrated a genuine issue of material fact that the facts recited above could give rise to an inference that she was terminated based on her

12

disability, there is no genuine issue of material fact that Defendant offered an unrebutted, legitimate, non-discriminatory, reason for her termination—the myriad issues that had arisen between Plaintiff and IT management and Human Resources before Plaintiff had her surgery and which continued along the same trajectory after she became disabled. Specifically, these issues included challenges with setting deadlines in terms of completion dates and work hours required, Plaintiff's objections both to her workload and the reassignment of some of her projects to other members of the department, challenges with differentiating between the priority level of different tasks, delegation issues, and interpersonal conflicts. Not only has Plaintiff failed to rebut these grounds for termination with record evidence, but it is also undisputed that in her 2019 Employee Performance Appraisal, prior to her surgery, she repeatedly expressed that she felt Defendant was preparing to terminate her employment based on these issues.[2] For these reasons, the Court will grant Defendant's motion for summary judgment.

The Court does not construe Plaintiff's August 31, 2023 letter to the Court as a motion for summary judgment but, were it so construed, the Court would deny summary judgment as she points to no record evidence supporting her ADA claim. To the extent Plaintiff seeks judgment in her favor based on Defendant's alleged discovery violations, given her failure to file a motion to compel, this relief is well beyond what is appropriate, even were the Court to credit her allegations and deem them legally sound. See Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv), (b)(2)(A)(v)-(vi).

## IV. CONCLUSION

For the above reasons, the Court will grant Defendant's motion for summary judgment. (D.I. 28). The Court will deny as moot Defendant's motion to amend the scheduling order and to

---

[2] In her 2019 Employee Performance Appraisal, Plaintiff disputed IT management's characterization of these issues, but that fact is not relevant to this analysis.

13

compel plaintiff's compliance with discovery (D.I. 22) and Plaintiff's request for a meeting (D.I. 23).

An appropriate Order will be entered.